[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14388
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-14188-DMM

JOEL WESLEY TRASK,

Petitioner-Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 14, 2017)

Before ED CARNES, Chief Judge, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Joel Trask threatened with a rifle two teenagers on the street outside his home. For that behavior, a Florida jury found him guilty of, among other things, two counts of aggravated assault with a deadly weapon. He sought relief in state court by filing a direct appeal of his convictions and later seeking post-conviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure. One of the claims Trask asserted was that his Sixth Amendment right to counsel was violated because his attorney's failure to investigate and present an insanity defense at trial amounted to constitutional ineffectiveness. After his efforts in state court were unsuccessful, he filed a 28 U.S.C. § 2254 petition in federal court. The district court denied his petition, but granted a certificate of appealability as to his ineffectiveness claim. This is Trask's appeal.

## I.

### A.

Late one night in July 2007, Christina McGlynn and Jennifer McCullough became lost on their way to a friend's house after Jennifer made a wrong turn onto the street where Trask lived. When they did, Trask came out of his house and started screaming at them. According to McCullough, they continued on their way but, because they were lost, soon ended up on Trask's street again. At that point, Trask made his way toward their car. He was holding a rifle.

Trask walked into the middle of the street and screamed at the teenagers, telling them that they needed to get away from his house and that they had five seconds to do so before he blew their heads off.  McCullough, who was driving, attempted to put the car in reverse, but the transmission dropped and the car would not move.  McGlynn began shouting to Trask that the car would not move.  He responded by pointing his rifle directly at the car.  At that point, McGlynn grabbed McCullough's head and ducked.  She heard the gun go off.

McGlynn grabbed her cell phone and called the friends the teens were on their way to visit for help.  In the meantime, Trask went back inside his house.  Trask's wife, Jill, emerged and picked up the shell casing from the rifle.  Then Trask came back out and began screaming at McCollough and McGlynn again, this time without the rifle.  Eventually, with the help of their friends, the teens moved the car to their friend's home.

Upon hearing the argument in the street, a neighbor called the police.  When the police arrived at his house, Trask admitted that he had used a rifle to scare some kids who were speeding through the neighborhood.  Trask also said that he didn't mean to fire the rifle.  Trask was slurring his speech, had bloodshot eyes, and smelled of alcohol.  The rifle Trask used as well as the shell casing his wife collected from the street were located inside his residence.  Trask was arrested and charged with two counts of aggravated assault with a deadly weapon, one count of

using a firearm in public, and one count of using a firearm while under the influence of alcohol.

## B.

Charles Nervine represented Trask at trial. Before Trask's trial, Nervine filed a motion requesting the appointment of a mental health expert to evaluate Trask's competency to stand trial and sanity at the time of the offense. At an evidentiary hearing on Trask's state post-conviction motion, Nervine testified that he filed that motion just to be sure he was not missing anything. He had no concerns about Trask's mental health based on his conversations with Trask.

Dr. Michael Riordan was appointed by the trial court to evaluate Trask. He prepared three reports: one evaluating Trask's sanity at the time of the offense, one evaluating Trask's competency to stand trial, and one addressing mitigation. He concluded that Trask was not sane at the time of the offense. According to Trask's briefs to this Court, Dr. Riordan's report on competency to stand trial was inconclusive.[1] Dr. Riordan forwarded these reports to Nervine and the Public Defender's Office, but no one followed up with him. Nervine could not

---

[1] Neither party provided the district court or this Court with copies of Dr. Riordan's reports or, indeed, any of the psychological reports that are central to the arguments in this case. And it is not this Court's usual practice to direct the parties to plug holes in the district court record. As a result, we rely on the descriptions of the reports contained in the testimony at the state post-conviction evidentiary hearing, in the state trial court's opinion denying post-conviction relief, and (to a limited extent) in the parties' briefs to this Court and to the other courts that have considered Trask's ineffectiveness claim.

specifically recall receiving Dr. Riordan's report indicating that Trask was insane at the time of the offense. And that report is not in the Public Defender's Office's files.

Nervine did request that another expert evaluate Trask's competency to stand trial. The trial court responded by appointing Dr. Steven Edney to evaluate <u>both</u> Trask's competence to stand trial and sanity at the time of the offense. Before receiving a report from Dr. Edney, Nervine filed a demand for a speedy trial. He testified at Trask's Rule 3.850 hearing that he did so because the State was having trouble locating its witnesses and he hoped that the trial would occur before they were found. He also testified that he probably heard from Dr. Edney before filing the speedy trial demand, as his usual practice would not have been to file a speedy trial demand if he had not heard back from a mental health expert appointed to evaluate his client. Dr. Edney's report concluded that Trask was not insane at the time of the offense.

Nervine also failed to interview Jill Trask, who was included on the State's witness list. She could have told him about Trask's history of mental illness and the medication he was taking, such as antidepressants and medication for bipolar disorder. She could also have told Nervine that Trask had behaved strangely on the night he committed the crimes. For instance, she testified at Trask's Rule 3.850 hearing that he was acting panicked and saying "they're trying to kill me."

Moreover, she claimed to have been watching when the rifle went off and testified that it was pointed up into the air when it fired.  Finally, she testified that a neighbor approached Trask after the gun went off and shook him, at which point Trask "shook his head, looked at [the neighbor] and went inside."

Trask's jury trial took place in January 2008.  McGlynn, McCullough, and several others testified for the State.  Nervine's strategy was to admit that Trask was guilty of improper exhibition of a firearm, but contend that the State's evidence was insufficient to prove that Trask was guilty of the more serious charges. Towards that end, Nervine attempted to discredit several of the State's witnesses.  But the defense presented no witnesses of its own.

The jury found Trask guilty on both counts of aggravated assault and the charge of discharging a firearm in public.[2]  The jury found him not guilty on the charge of using a firearm while intoxicated.  He was sentenced to twenty years imprisonment.  Trask's conviction was affirmed on direct appeal.

## C.

Trask filed a motion for post-conviction relief under Rule 3.850.  He contended that Nervine provided ineffective assistance of counsel at his trial because he failed to investigate and present an insanity defense and failed to

---

[2] The conviction for discharging a firearm in public was dismissed by the trial court because it is a lesser included offense of aggravated assault with a deadly weapon.

consult Trask before filing a speedy trial demand.[3]  The state post-conviction court

held a hearing on the insanity defense claim.

In addition to Nervine and his supervisor, who testified about the reasoning

behind the way Nervine conducted the defense at trial, Dr. Riordan testified about

his findings.  He testified that he conducted a mental status examination of Trask

(which included taking a psychosocial history) and conducted a clinical interview

of him.  Dr. Riordan also reviewed his own prior psychological assessment of

Trask, which he had completed in 2006 as part of an application for social security

disability.  Dr. Riordan testified that Trask had a documented history of mental

illness, including visits to mental health facilities, anger management training, and

participation in Alcoholics Anonymous.  Trask told Dr. Riordan that he had been

diagnosed with bipolar disorder and had been treated by a psychiatrist and a

counselor.  Dr. Riordan did not speak to Trask's wife or any of the other witnesses

in the case, but testified that he would have if he had been asked to.

Dr. Riordan testified that he believed Trask could have suffered a brain

injury as a result of the whiplash injuries he sustained in two car accidents (though

he admitted further examination would have been needed to support that claim).

---

[3] Although he did raise the speedy trial demand claim in his § 2254 petition, in his briefs to this Court Trask challenges only Nervine's decision not to present an insanity defense.  As a result, Trask has abandoned any argument regarding Nervine's alleged failure to consult with him concerning the speedy trial demand and we do not address that claim.  Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

He also testified that Trask had diabetes, which could cause delirium — especially because Trask was not controlling his illness and was using alcohol.  Dr. Riordan explained that he ultimately concluded Trask was insane because he suffered from an anxiety disorder and panic attacks as a result of two prior car accidents.[4]  He testified that this "panic condition" or "high level of anxiety" interfered with Trask's ability to think clearly.  Trask's diabetic condition could also have contributed to that.  Dr. Riordan explained that Trask's condition could have been triggered by seeing cars being driven in a reckless or dangerous manner. Dr. Riordan testified that the fact that Trask may have attempted to conceal evidence of his crime would not have precluded his conclusion that Trask was insane, because there was "an impulsive aspect to his behavior" and "it's quite possible that a person can be insane at the time of an offense . . . and then subsequently realize . . . more about what has happened . . . and that maybe he did do something wrong and then try to cover up."

Dr. Edney's report was admitted into evidence at the hearing, but he did not testify.

---

[4] At one point in his testimony, Dr. Riordan testified that he also "formally carried" diagnoses of a mood disorder, alcohol abuse, panic disorder with agoraphobia, a personality disorder, chronic back pain, a back injury, diabetes, and high blood pressure.  But when asked directly what led to his conclusion that Trask was insane, Dr. Riordan focused on anxiety, the "panic condition," and diabetes.

D.

The state post-conviction court denied Trask's Rule 3.850 motion.  It concluded that, even assuming Nervine's representation was deficient, Trask failed to show that he was prejudiced by his counsel's alleged errors.  The opinion's language makes clear that the court's decision was based on a conclusion that Dr. Riordan's testimony was not credible.[5]  The opinion emphasizes the fact that his conclusions were based largely on his conversations with Trask.  It also points to the apparent inconsistency between Dr. Riordan's conclusion that Trask was not in his right mind at the time of the offense and Trask's lucid description of events to the police at the time he was arrested.  Finally, the post-conviction court was not persuaded by Dr. Riordan's attempt to reconcile his finding of insanity with the fact that Trask took the rifle inside and left it there.  Florida's Fourth District Court of Appeal summarily affirmed that decision.

Trask then filed a § 2254 petition in federal district court.  The district court denied the petition, concluding that the state court's conclusion that Trask had suffered no prejudice was not unreasonable.  It granted Trask's request for a certificate of appealability on two issues:  (1) whether the state court's application of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), to Trask's

---

[5] We do not require the state courts to use any particular wording or phrasing when making a decision, but instead focus on the gist of the opinion when read as a whole.  See Jones v. Sec'y, Fla. Dep't. of Corr., 834 F.3d 1299, 1311 (11th Cir. 2016) ("[W]e have cautioned that overemphasis on the language of a state court's rationale would lead to a grading papers approach that is outmoded in the post-AEDPA era.").

claims was entitled to deference under AEDPA and, if not, (2) whether Trask has

adequately demonstrated ineffective assistance of counsel under Strickland.

## II.

"We review a district court's denial of federal habeas relief de novo." Jones

v. Sec'y, Fla. Dep't. of Corr., 834 F.3d 1299, 1310 (11th Cir. 2016).  But, because

Trask's ineffectiveness claim has been adjudicated on the merits by the Florida

state courts, our review is circumscribed by 28 U.S.C. § 2254(d).

> Federal habeas relief may not be granted for claims subject to
> § 2254(d) unless it is shown that the earlier state court's decision 'was
> contrary to' federal law then clearly established in the holdings of [the
> Supreme Court of the United States]; or that it 'involved an
> unreasonable application of' such law; or that it 'was based on an
> unreasonable determination of the facts' in light of the record before
> the state court.

Harrington v. Richter, 562 U.S. 86, 100, 131 S. Ct. 770, 785 (2011) (quoting 28

U.S.C. § 2254(d)) (citations omitted).  A state court's application of Supreme

Court precedent to a defendant's claim is not unreasonable "so long as fairminded

jurists could disagree on the correctness of the state court's decision."  Id. at 101,

131 S. Ct. at 786 (quotation marks omitted).  "If this standard is difficult to meet

— and it is — that is because it was meant to be."  Burt v. Titlow, 571 U.S. ___,

134 S. Ct. 10, 16 (2013) (quotation marks omitted).  Courts should "not lightly

conclude that a State's criminal justice system has experienced the extreme

malfunction for which federal habeas relief is the remedy." Id. (quotation marks and alterations omitted).

In Strickland, 466 U.S. at 687–88, 692, 104 S. Ct. at 2064–65, 2067, the Supreme Court explained that a defendant asserting a Sixth Amendment ineffective assistance of counsel claim must show (1) that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that he was prejudiced as a result.

Courts are permitted to address the two prongs of the Strickland test in any order. Id. at 697, 104 S. Ct. at 2069. Like the other courts that have addressed Trask's claim, we find this case easier to resolve on the prejudice prong. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. Id.

Trask contends that the Florida courts unreasonably applied that standard to his ineffective assistance claim. We disagree. Even assuming that Nervine's performance was deficient, it would have been reasonable for the state appellate court to conclude that Trask was not prejudiced by Nervine's failure to investigate or assert an insanity defense.

11

Where — as here — a state appellate court summarily affirms the state trial court's denial of post-conviction relief without providing a reasoned opinion, we do not "look through" the appellate court's order and assume that it approved of the state trial court's reasoning. Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1235–42 (11th Cir. 2016) (en banc).[6] Instead, we ask whether there is any reasonable basis for denying relief. Id. at 1235.

At his state post-conviction hearing, Trask presented the testimony of Dr. Riordan to support his contention that he had a viable insanity defense. But the state trial court did not find Riordan's testimony credible and the state appellate court could have adopted that finding. Moreover, the report of another expert, Dr. Edney, concluded that Trask was sane at time of the offense.[7]

---

[6] As a result, Trask's contention that the Florida trial court applied the wrong standard when it determined that he had failed to establish prejudice is irrelevant. We assume that the Florida District Court of Appeal applied the correct standard, notwithstanding any error in the trial court. Wilson, 834 F.3d at 1238 ("[E]ven when the opinion of a lower state court contains flawed reasoning, [AEDPA] requires that we give the last state court to adjudicate the prisoner's claim on the merits the benefit of the doubt and presume that it followed the law." (quotation marks omitted)). Because the Florida District Court of Appeal could have rejected Trask's claims applying the correct standard, as we presume it did, we must affirm the district court's denial of Trask's petition.

[7] Contrary to Trask's assertion, the Florida trial court directed Dr. Edney to address both competency to stand trial and insanity at the time of the offense, even though Nervine's motion only requested a competency evaluation. And the testimony at Trask's Rule 3.850 hearing confirmed that Dr. Edney did address sanity in his report, though not in a separate section of his report and perhaps not as extensively as he addressed competency. Because Dr. Edney's report was not made part of the record on appeal, see supra note 2, we rely on the evidence in the record showing that Dr. Edney did address Trask's sanity at the time of the offense.

"When there is conflicting testimony by expert witnesses [in a state collateral proceeding] . . . discounting the testimony of one expert constitutes a credibility determination, a finding of fact." Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000). Trask has not shown, as AEDPA requires, that it would have been unreasonable for the state courts to find that Dr. Riordan's testimony was not credible. See 28 U.S.C. § 2254(d)(2). Nor has he shown that it would have been unreasonable for them to credit Dr. Edney's evaluation instead.[8]

As the state post-conviction court's opinion points out, Dr. Riordan's testimony was based in substantial part on self-reported information from Trask. And, as the opinion also noted, Trask's behavior at the time of the offense and conversations with the arresting officers appeared to be lucid. Moreover, even Dr. Riordan suggested at least once during his testimony that he would have to investigate further to fully substantiate some of his conclusions. Trask did not demonstrate what those efforts would have revealed.[9]

---

[8] Dr. Edney's report was not completed until after Trask's trial, so it would not bear on the reasonableness of Nervine's conduct (assuming for the sake of argument that Nervine did not speak to Dr. Edney before filing a speedy trial demand). But it does bear on prejudice, because it sheds light on the viability of his insanity defense. If Nervine had presented an insanity defense, experts like Dr. Edney could have been called by the State to refute it.

[9] Although Trask makes only a brief mention of it in his reply brief, it does appear from the record that Dr. Neil Merkatz, a psychiatrist Trask began seeing after his arrest (and whom Nervine did not interview), could have testified that Trask suffered from bipolar disorder at the time of the offense and "has poor medication compliance." Even so, suffering from a mental illness and failing to take one's medication does not necessarily mean that one is legally insane. Without more information about Dr. Merkatz's analysis than appears in the record, we cannot

13

Trask challenges as unreliable Dr. Edney's conclusion that he was not insane at the time of the offense by suggesting that Dr. Edney's treatment of the insanity issue was cursory, pointing out that he may have mixed the competence and sanity inquiries together, and by arguing (incorrectly) that Dr. Edney was never asked to determine Trask's sanity at the time of the offense. Those perceived deficiencies are not significant enough to make a state court's decision to credit Dr. Edney's testimony over that of Dr. Riordan unreasonable.

Trask attempts to blame the State for his inability to cross-examine Dr. Edney to expose further weaknesses in his analysis, because the State did not call Dr. Edney as a witness at his post-conviction hearing. But Trask is the one who bears the burden of demonstrating prejudice, and he could have subpoenaed Dr. Edney just as easily as the State.

It is true that the state trial court's post-conviction opinion may contain factual errors. For instance, the opinion asserts that the police arrived within a few minutes of the gunshot, but it is unclear from the record whether that is correct. We cannot assume, however, that the Florida District Court of Appeal when it reviewed Trask's case repeated any errors the trial court made. There is ample evidence in the record, even setting aside any claimed factual errors in the post-

---

say that the state courts erred by focusing on the analysis of experts who actually reached a conclusion about Trask's sanity at the time of the offense.

14

conviction court's opinion, to support an adverse credibility determination as to Dr. Riordan.  As a result, we cannot say that it would have been unreasonable for the Florida courts to discount his testimony.

We also cannot say that it would have been unreasonable to give little, if any, weight to Jill Trask's testimony.  Discounting the testimony of an interested witness that is contradicted by other evidence in the record is far from unreasonable.

It follows that it would have been reasonable to conclude — based on the adverse credibility determinations — that the jury would not have believed Dr. Riordan's or Jill Trask's testimony and would have rejected Trask's proposed insanity defense.  That is especially so because Dr. Riordan's testimony would likely have been rebutted by contrary expert testimony like Dr. Edney's.

For these reasons, it would not have been unreasonable for the Florida courts to conclude that Trask failed to show a reasonable probability that, but for Nervine's alleged deficiencies, the result of his trial would have been different.  As a result, the district court did not err in denying habeas relief.

**AFFIRMED.**